# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

RONALD C.,

    *Plaintiff,*

v.

    Case No. 1:25-cv-01158-RLH

FRANK BISIGNANO, Commissioner of
Social Security,

    *Defendant.*

## ORDER & OPINION

Plaintiff Ronald C. ("Ronald") filed this suit to challenge an administrative law judge's finding that he was not disabled under the Social Security Act and thus ineligible for benefits. The parties have consented to final disposition by a U.S. Magistrate Judge. (Doc. 8.) Because the ALJ's decision was supported by substantial evidence, the Commissioner's decision will be affirmed.

## LEGAL STANDARD

### I.  The Social Security Act

The Social Security Act—and the regulations adopted under it—explain in detail who is eligible to receive social security benefits. To qualify, a claimant must be sixty-five years of age, blind, or disabled. 20 C.F.R. § 416.202(a)(1)–(3). A claimant is disabled if she cannot "do any substantial gainful activity" because she suffers from "any medically determinable physical or mental impairment" that is either life-threatening or chronic. 42 U.S.C. § 423(d)(1)(A).

To implement that definition, the Social Security Administration has developed a five-step evaluation process. *See* 20 C.F.R. § 416.920(a)(1). The steps proceed sequentially:

**Step One.** Is the claimant currently engaged in substantial gainful activity?

**Step Two.** Does the claimant have a severe mental or physical impairment—i.e., an impairment that significantly limits their ability to do basic work activities—or a combination of them?

**Step Three.** Does the mental or physical impairment appear on an enumerated list (called "listings")? If not, is it nonetheless medically equal to one of those listings?

**RFC Assessment.** What is the claimant's residual functional capacity (RFC)—that is, the most they can still do despite their limitations?

**Step Four.** Based on the claimant's RFC, can they perform their past work?

**Step Five.** Based on the claimant's RFC, can they perform other work?

*See id.* § 416.920(a)(4)(i)–(v). The ALJ begins, of course, at step one. If it yields an affirmative answer (i.e., the claimant is working), the claimant is not disabled, and the inquiry ends. If step two yields a negative answer (i.e., the claimant does not have a severe impairment), the claimant is not disabled, and the inquiry ends. *See id.* §416.920(a)(4)(i)–(ii). Step three, however, is dispositive: If the claimant's impairment appears on a listing, the claimant is considered disabled and eligible for benefits. *See id.* § 416.920(a)(4)(iii). If the claimant's impairment does not appear on or medically equal a listing, the ALJ crafts an "RFC Assessment," which analyzes "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from [their] impairment." *Moore v. Colvin*, 743 F.3d 1118, 1121

(7th Cir. 2014). If either steps four or five yield an affirmative answer (i.e., the claimant can perform their old job or adjust to a new one in light of the RFC), the claimant is not disabled. *See* 20 C.F.R. § 416.920(a)(4)(iv)–(v).

The claimant has the burdens of production and persuasion through step four. *See Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022). At step five, the burden shifts to the Commissioner to show that the claimant can engage in some type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

## II.      Standard of Review

A court's function on review is limited to determining whether the ALJ's findings are supported by substantial evidence and based upon proper legal criteria. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Substantial evidence, in turn, is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (explaining that the threshold "is not high"); *Schneck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) ("Substantial evidence may be less than the weight of the evidence, and more than a scintilla." (citation modified)). Yet, while the ALJ's decision commands deference, courts may not simply "rubber stamp" it. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

3

The Seventh Circuit has emphasized that ALJs are "subject to only the most minimal of articulation requirements" and "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). Instead, ALJ's need only "provide an explanation for how the evidence leads to their conclusions that is 'sufficient to allow . . . a reviewing court, to assess the validity of the agency's ultimate findings and afford [the plaintiff] meaningful judicial review.'" *Id.* at 1054 (alteration in original) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary"—not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Therefore, courts reviewing for substantial evidence may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [their] judgment for the ALJ's determination so long as substantial evidence supports" the decision under review. *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). In short, the ALJ must build "an accurate and logical bridge" between the evidence in the record and his conclusions. *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013).

## BACKGROUND

### I. Ronald

Ronald was born in 1982, (R. at 348[1]), and has received his high school diploma, (R. at 355). He stopped working in 2017 following a car accident that resulted in a traumatic brain injury. (R. at 241, 259.) Before that, he was an industrial mechanic. (R. at 242, 249.) Ronald alleged that he was disabled and thus unable to sustain full time employment primarily because of his back issues, traumatic brain injury, and mental health impairments—including attention deficit disorder. (R. at 22.)

### II. Procedural History

Ronald applied to the Social Security Administration for supplemental security income and disability benefits in November 2019, alleging that he has been disabled since March 24, 2017. (R. at 17.) His application was initially denied in April 2021 and denied upon reconsideration in August. (R. at 17.) He then requested a hearing before an ALJ, (R. at 17), which took place in December 2021, (R. at 31).

After the hearing, the ALJ issued a written opinion concluding that Ronald was not disabled and therefore not entitled benefits. (R. at 27.) In response, Ronald sought review of the ALJ's decision with the Appeals Council, who granted his request for review but nonetheless affirmed the ALJ's denial. (R. at 4–8.) Ronald then filed a complaint in this Court to challenge the ALJ's decision. (R. at 1967.) The parties jointly moved to remand Ronald's case back to the Commissioner. (R. at 2016.)

---

[1] "R." refers to the Certified Administrative Record filed on July 23, 2025. (Doc. 6.) The page numbers cited in this R&R refer to the black page numbers at the bottom right of each page of the transcript rather than the green page numbers generated automatically by CM/ECF at the top right.

This Court granted that motion and directed the ALJ to "provide [Ronald] the opportunity for a new hearing to determine whether [Ronald] is disabled within the meaning of the Social Security Act." (R. at 2013.) "In so doing," the Court continued, "the ALJ shall appropriately weigh and evaluate examining opinions and vocational expert testimony." (R. at 2013.) The case made its way back to the Appeals Council, who vacated the ALJ's previous decision and instructed him to (1) reevaluate whether Ronald "can perform other work existing in significant numbers in the national economy"; (2) obtain further evidence from a vocational expert to that end; and (3) further consider Ronald's RFC, with "specific references" to evidence in the record. (R. at 2024–25.)

On remand, the ALJ held another hearing and issued a second written opinion in January 2025. (R. at 1889–1902.) The ALJ again concluded, however, that Ronald was not disabled and thus not eligible for benefits. (R. at 1902.) Rather than asking the Appeals Council to review that decision, Ronald filed a complaint in this Court. *See* 20 C.F.R. § 404.984 (authorizing that practice). He filed his opening brief in July 2025, (Doc. 9), and the Commissioner responded, (Doc. 11).

## III.   The ALJ's Decision

In his opinion, the ALJ used the five-step evaluation process outlined above to determine whether Ronald was disabled. At step one, he determined that Ronald has not engaged "in substantial gainful activity" since March 24, 2017—the date Ronald alleged he became disabled. (R. at 1892.) At step two, the ALJ found that Ronald had the following severe impairments: (1) degenerative disc disease; (2) history of

6

traumatic brain injury with migraine; (3) history of attention deficit disorder; and (4) anxiety disorder. (R. at 1892.) At step three, the ALJ concluded that none of those impairments met or medically equaled any of the listed impairments. (R. at 1882–84.) Before proceeding to steps four and five, the ALJ crafted the following RFC assessment:

> [Ronald] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following non-exertional limitations. [Ronald] should never climb ladders, ropes, or scaffolds. He can climb ramps and/or stairs, balance, stoop, kneel, crouch and/or crawl no more than occasionally. He should reach overhead no more than occasionally and reach in any other direction no more than frequently. He should handle and finger no more than frequently. [Ronald] can understand and remember simple instructions and due to deficits in memory, concentration persistence and pace, he is reasonably limited to performing simple and routine tasks on a sustained basis with only routine breaks. Any work should involve no more than ordinary or routine changes in work setting or duties. Any work should involve no more than occasional interaction or contact with the general public, and any work should not require more than occasional interaction with coworkers or supervisors.

(R. at 1894.) At step four, the ALJ found that Ronald had no past relevant work. (R. at 1901.) Finally, at step five, the ALJ concluded that Ronald—based on his age, education, work experience, and RFC—could perform jobs that exist in significant numbers in the national economy. (R. at 1901.) Examples of those jobs included mail clerk, collator operator, and cleaner. (R. at 1902.) Based on the ALJ's conclusion at step five, he determined that Ronald is not disabled. (R. at 1902.)

## DISCUSSION

Ronald makes one argument: the ALJ did not adequately address two medical opinions in the record. He observes that this Court's previous remand order directed the ALJ to "appropriately weigh and evaluate examining opinions." (R. at 2013.) And

7

he accuses the ALJ of violating that instruction with respect to two doctors: Dr. Benjamin Richter and Dr. Drake Steed. The Commissioner responds that the ALJ properly evaluated Dr. Richter's opinion and that—although the ALJ overlooked Dr. Steed's opinion—the oversight was harmless.[2] The Court agrees.

The following standards guide the Court's inquiry. ALJs must "evaluate every medical opinion" they receive. 20 C.F.R. § 404.1257(c). Of course, they need not accept those opinions without question. *See id.* § 404.1527(d). But when they reject an opinion, they "must provide enough analysis to allow a reviewing court some idea of why" they did so. *Spicher v. Berryhill*, 898 F.3d 754, 758 (7th Cir. 2018). Although "ALJs need not comment on every line of a physician's treatment notes," *Kolar v. Berryhill*, 695 F. App'x 161, 161–62 (7th Cir. 2017), they must, at a minimum, "respond to the physician's principal conclusions." *Kolar*, 695 F. App'x at 162. By the same token, ALJs are often faced with conflicting medical opinions. In that case, the ALJ must "evaluate[] the evidence" and justify why they are according more weight to one opinion over another. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004); *see also Colson v. Colvin*, 120 F. Supp. 3d 778, 793 (N.D. Ill. 2015). For claims filed after March 2017 (like Ronald's), ALJs must assess medical opinions in light of several factors. *See* 20 C.F.R. § 404.1520c. Those factors include: (1) supportability,

---

[2] Technically, Ronald's brief has two argument headings. The first is that the ALJ's analysis of the medical opinions violated the regulations; the second is that his analysis violated this Court's previous remand order. But these are one in the same. The Court's remand order instructed the ALJ to "*appropriately* weigh and evaluate examining opinions." (R. at 2013 (emphasis added).) But "appropriate" in that context means nothing more than "in accordance with the regulations." The remand order did not impose an independent obligation on the ALJ with respect to medical opinions beyond what the regulations already required of him. Otherwise, the Court would have so specified. The Court's remand order and the regulations are therefore coextensive; a violation of one is a violation of the other. The Court treats these two arguments as one.

meaning the objective medical evidence on which the opinion is grounded; (2) consistency with other evidence; (3) the physician's relationship to the claimant; and (4) the physician's bona fides. *See id.* § 404.1520c(c)(1)–(5).   Unsurprisingly, the supportability and consistency of an opinion are the most important. *See id.* § 404.1520c(a).

## I.   Dr Richter's Opinion

The ALJ explicitly addressed the opinion of Dr. Richter. He began by recognizing that Dr. Richter "note[d] significant deficits in executive function, as well as inconsistent performances in episodic memory." (R. at 1900.) The ALJ then quoted the portion of Dr. Richter's opinion that Ronald would be unable to return to his previous work as a mill technician, and the ALJ agreed with that conclusion: "[T]he undersigned does agree that the record supports a finding that [Ronald] cannot perform his past work due to physical and mental limitations." (R. at 1900.) But the ALJ *disagreed* with Dr. Richter's conclusion that Ronald "would appear to be a suitable candidate for disability benefits." (R. at 1900 (quoting R. at 2205).) This conclusion, the ALJ explained, was "not persuasive" because it "addresse[d] the ultimate issue" of whether Ronald is disabled within the meaning of the Social Security Act.[3] (R. at 1900.) The ALJ also observed that Dr. Richter did not have the benefit of reviewing all the medical evidence in the record: "[A]lthough Dr. Richter carefully reviewed the prior neuropsychological evaluations, he did not have the

---

[3] Ronald does not challenge this finding, nor could he: The regulations explicitly reserve to the Commissioner the ultimate question whether a claimant is disabled. *See* 20 C.F.R. 404.1520b(c)(3)(i). Evidence of this kind is therefore "inherently neither valuable or persuasive." *Id.* § 404.1520b(c).

opportunity to consider all of the medical records, including the consultative examinations that reflect less cognitive deficits." (R. at 1900.) In short, the ALJ agreed with Dr. Richter that Ronald suffers from some degree of cognitive impairment, but disagreed that his impairments render him unable to work.

Ronald mounts a number of challenges to the ALJ's analysis, but none are persuasive. First, he observes that Dr. Richter examined Ronald on three separate occasions—first in October 2017, then in September 2019, and finally in January 2024. (Pl. Br. 16.) The ALJ's analysis, Ronald argues, improperly addressed each of these visits in one paragraph rather than independently. But this was not error. Indeed, as the Commissioner observes, the regulations expressly allow ALJ's to "consider the medical opinions . . . in a single analysis" rather than "individually" "when a medical source provides multiple medical opinion(s)." 20 C.R.F. § 404.1520c(b)(1). This is because it would not be "administratively feasible" for ALJs to articulate how they "considered all of the factors for all of the medical opinions" in the record. *Id.* Thus, the ALJ did not err by addressing each of Dr. Richter's three opinions in a combined analysis. *See id.*

Second, Ronald argues that the ALJ's analysis impermissibly employs "general statements." (Pl. Br. 16–17.) But the ALJ did not simply include boilerplate credibility language and end there. To the contrary, the ALJ expressly recognized that Dr. Richter found that Ronald possessed "significant deficits in executive function" and inconsistent memory. (R. at 1900.) And the ALJ agreed with that evaluation, along with the portion of Dr. Richter's opinion that concluded Ronald

could not perform his past work. What the ALJ disagreed with, however, was that Ronald's neurological impairments render him unable to perform *any* work.

Ronald leans heavily on *Wolford v. Kijakazi*, 658 F. Supp. 3d 664, 670 (N.D. Ind. 2023), but that case is distinguishable. Indeed, the ALJ in *Wolford* merely slapped general labels on the medical opinions—"persuasive," "generally persuasive," or "somewhat persuasive"—but otherwise did not elaborate on how those labels were chosen. *Id.* at 670–71. The ALJ here, by contrast, specified which portions of Dr. Richter's opinion he agreed with (Ronald has neurological impairments that prevent him from performing his previous work); which portions he disagreed with (that Ronald is eligible for disability benefits); and why (because the ultimate disability determination was not Dr. Richter's to make). (*See* R. at 1900.) The ALJ also explained that Dr. Richter's findings were inconsistent with the consultative examinations that showed "less cognitive deficits." (R. at 1900.) That distinguishes this case from *Wolford*—unlike that court, this Court can "track[] the rationale" that drove the ALJ's assessment of Dr. Richter's opinion. *Wolford*, 658 F. Supp. 3d at 671.

Third, Ronald argues that the ALJ did not adequately address the specific limitations that Dr. Richter assigned. (*See* Pl. Br. 17.) This argument, however, overreads Dr. Richter's opinion. For one thing, Dr. Richter opined that "*[p]eople* with executive dysfunction" generally possess certain symptoms, including "difficulty knowing what is important" and trouble "understanding the steps necessary to complete [a] task." (R. at 2408.) But such general statements about the symptoms that people with executive dysfunction *tend* to show do not amount to a limitation on

11

*Ronald's* ability to work. For another thing, Dr. Richter explained that Ronald "may be able to compensate for" his symptoms "in an environment that has routine, structure, and support from coworkers" and that Ronald may be able to complete "[t]asks that are rote" rather "than those with a high degree of complexity." (R. at 2408.) Yet a cursory review of the ALJ's opinion shows that he *agreed* with this finding: The ALJ limited Ronald to "performing simple and routine tasks on a sustained basis." (R. at 1894.) Thus, although the ALJ did not expressly address this portion of Dr. Richter's opinion, he implicitly adopted it. Ronald fails to show why this was reversible error.

In a similar vein, Ronald argues that Dr. Richter prescribed "an environment with additional supervision" for Ronald. (Pl. Br. 17.) But this misreads Dr. Richter's opinion. Dr. Richter did *not* find that Ronald would require an outsized degree of supervision generally. Instead, he suggested that the only way to ascertain Ronald's ability to perform his old job—the "diagnosis and repair of machinery"—would "be for him to have on-the-job training and supervision (such as what a new hire might have)." (R. at 2408.) In other words, Dr. Richter expressly left open the possibility that Ronald would be able to perform his previous work, depending on the level of supervision and how he performed upon being hired. But the ALJ rejected that finding and instead limited Ronald to light work with several non-exertional limitations. In this way, the ALJ's RFC analysis was *more restrictive* than Dr. Richter's. A remand for the ALJ to more fully assess the opinion would therefore not change the result. *See Thomas H. v. Kijakazi*, No. 3:22-cv-50331, 2023 WL 6388145,

12

at *2 (N.D. Ill. Sept. 29, 2023) (explaining that remand is inappropriate if the Court is confident that the result would be the same).

Fourth and finally, Ronald turns to the regulations and argues that the ALJ failed to march through two factors—supportability and consistency. *See id.* § 404.1520c(a). Ronald observes that Dr. Richter's opinion was well supported by objective medical evidence—including neurological tests. But the ALJ expressly recognized that fact: "Dr. Richter carefully reviewed the prior neuropsychological evaluations." (R. at 1900.) Ronald's brief quotes extensively from Dr. Richter's opinion to show that the opinion was well reasoned and supported by the results of objective exams. (*See, e.g.,* Pl. Br. 18.) But Ronald fails to demonstrate why a closer review of Dr. Richter's "long narrative explanations" would have dictated a result other than what the ALJ here found. (Pl. Br. 17.) Ronald does not argue, for instance, that Dr. Richter's interpretation of Ronald's medical exams warrant a greater limitation than "performing simple and routine tasks," which is the limitation that ALJ imposed to address Ronald's cognitive impairments. (R. at 1894.)

Similarly, Ronald argues that Dr. Richter's opinion was consistent with the other medical opinions in the record. True, the ALJ found that Dr Richter "did not have the opportunity to consider all of the medical records, including the consultative examinations that reflect less cognitive deficits." (R. at 1900.) And yes, the consultative exam may have been consistent with Dr. Richter's conclusions. (*See* Pl. Br. 19.) Likewise, the ALJ certainly could have discussed the similarities and conflicts between Dr. Richter's opinion and those offered by other psychologists in greater depth. But again, Ronald does not suggest why that would have changed the outcome. The mere fact that

13

the ALJ could have said more does not warrant remand; Ronald must identify *why* the evidence that the ALJ overlooked would have dictated a different result. Because the Court sees no reason why a lengthier discussion of Dr. Richter's opinion would have driven the ALJ to a different result here, a remand would be inappropriate.

For Ronald's part, he does offer one reason why the ALJ's analysis of Dr. Richter's opinion was prejudicial: the vocational expert at the first hearing "testified that a retraining period over a week would preclude employment." (Pl. Br. 20.) And "the limitations from Dr. Richter warranted further supervision." (Pl. Br. 20.) So if the ALJ credited Dr. Richter's opinion, the argument runs, he would have concluded that Ronald required retraining and thus could not work. But as discussed above, Dr. Richter did *not* intimate that Ronald would require extra supervision regardless of the job he was performing; instead, he hypothesized that Ronald may need supervision while performing his previous job as a mechanic. Ronald's argument conflates the two: the degree of supervision necessary to determine whether Ronald could perform his old job is irrelevant to the question whether he is able to perform significantly less-skilled work. *See infra* note 4. Ronald has not demonstrated prejudicial error.

## II. Dr. Steed's Opinion

All agree that the ALJ failed to discuss the opinion of Dr. Steed, a psychologist who evaluated Ronald in July 2019. (Pl. Br. 9; Comm'r Br. 5–6.) This violated the ALJ's obligation to "evaluate every medical opinion" in the record. 20 C.F.R. § 404.1257(c). The sole question, therefore, is whether the error warrants remand.

Ronald says yes, but the Court disagrees. He argues that Dr. Steed explained that Ronald "would need additional oversight at work, need to adjust back to work,

14

need an on the job probationary period, and have oversight at each new level or responsibility or task." (Pl. Br. 20.) But this harmful-error argument rests on the same misreading identified above. Dr. Steed did *not* opine that Ronald would need a probationary period regardless of the work he was performing; instead, Dr. Steed expressed "reservations about [Ronald] returning to his position as a millwright without at least a probationary period to start off." (R. at 357.) This could hypothetically include, Dr. Steed continued, "reduced hours, beginning with the most basic responsibilities and tasks." (R. at 357.) Thus, Dr. Steed did not impose a general probationary-period limitation; he explained that he *could not determine* whether Ronald could return to his previous employment, and that a probationary period may be helpful in making that determination.

Dr. Steed's opinion is therefore nearly identical to Dr. Richter's. Because the ALJ evaluated and partially rejected the former, he did not err by failing to address the latter. And in fact, Dr. Steed's opinion expressly contemplated that Ronald would be able to return to work at his previous role (a job in the medium exertional category), subject to certain conditions. The Court struggles to understand how Dr. Steed's opinion that Ronald *may* be able to perform skilled work would support the conclusion that he *cannot* perform "simple and routine tasks."[4] Thus, although the

---

[4] Indeed, the vocational expert at the first hearing classified Ronald's previous work—a millwright—at an SVP level of 7 and a medium exertional level. (R. at 2051.) The jobs offered for a person with Ronald's RFC at the second hearing, however, were "light, unskilled," with an SVP of 2. (R. at 1935.) So it would seem that Dr. Steed's opinion strongly refutes the conclusion that Ronald would not be able to perform the jobs offered by the ALJ at step five of the evaluation process.

15

ALJ erred by failing to discuss Dr. Steed's opinion, the Court is confident that the result would not change on remand. *See Thomas H.*, 2023 WL 6388145, at *2.

## CONCLUSION

IT IS THEREFORE ORDERED that the Commissioner's decision be affirmed. The Clerk is DIRECTED to enter judgment and close this case.

*So ordered.*

Entered this 18th day of May 2026.

s/ Ronald L. Hanna

Ronald L. Hanna
United States Magistrate Judge

16